IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARIE H.,[1]

        Plaintiff,

     v.                                    Civil No. 3:20-cv-924 (DJN)

KILOLO KIJAKAZI,[2]
Acting Commissioner of Social Security,

        Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance and supplemental insurance benefits under the Social Security Act (the "Act"). Plaintiff was forty-seven years old at the time of the alleged onset date and last worked as a cable technician. (R. at 150, 280.) Plaintiff alleges she is unable to work due to bipolar disorder, attention deficit disorder, post-traumatic stress disorder, and manic depression. (R. at 279.)

On December 18, 2019, an Administrative Law Judge ("ALJ") found Plaintiff not disabled from September 26, 2018 through December 18, 2019. (R. at 7, 21.) After exhausting her

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kijakazi should be substituted as the defendant in this suit.

administrative remedies, Plaintiff now seeks review of the ALJ's decision. (Pl.'s Mem. Supp. Mot. Summ. J. 1 (ECF No. 24) ("Pl.'s Mem.")).

This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, which are now ripe for review.[3] Having reviewed the parties' submissions and the entire record in this case, and for the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 23) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 25) be DENIED, and that the final decision of the Commissioner be VACATED and REMANDED.

## I. PROCEDURAL HISTORY

On October 26, 2018, Plaintiff filed an application for disability insurance benefits and supplemental security income, alleging disability beginning September 26, 2018, due to various mental health impairments. (R. at 250, 256, 279.) The Social Security Administration ("SSA") initially denied the claim on February 12, 2019 (R. at 202) and again upon reconsideration on April 10, 2019. (R. at 212.) At Plaintiff's written request, the ALJ held a hearing on November 13, 2019. (R. at 29-83, 226.) At the hearing, testimony was taken from Plaintiff, a social worker and an impartial vocational expert. (R. at 29-83.) On December 18, 2019, the ALJ issued a written opinion and denied Plaintiff's claim. (R. at 7-21.) On October 15, 2020, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse

the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.925(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. §§ 416.920(e), 404.1520(e). However, if the claimant can perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 13-21.) At step one, the ALJ determined that Plaintiff had not

engaged in substantial gainful activity since September 26, 2018, her alleged onset date of disability.[4] (R. at 13.) At step two, the ALJ determined that Plaintiff suffered from the severe impairments of hypertension, obesity, bipolar disorder, depression, anxiety, borderline personality disorder, and posttraumatic stress disorder. (R. at 13.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13.)

After step three, the ALJ considered Plaintiff's residual functional capacity.[5] (R. at 15.) The ALJ found that Plaintiff had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), with the following exceptions:

> [T]he claimant can frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds; understand, remember, apply, and carry out simple repetitive tasks, consistent with unskilled repetitive work; concentrate, persist, and maintain pace to complete unskilled repetitive tasks that do not require production rate pace, meaning fast pace; have routine interactions with coworkers and supervisors, in

---

[4] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[5] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

settings where tasks involve work primarily with objects rather than people; have no contact with the public; and adapt to occasional changes associated with unskilled repetitive work.

(R. at 15.)

Based on this determination, the ALJ considered at step four of the analysis whether Plaintiff could perform her past relevant work as a hand packager, at least in the manner in which such work is generally performed.[6] (R. at 19.) The ALJ found that Plaintiff could perform her past work as a hand packager because that job does not require the performance of work-related activities that are incompatible with her residual functional capacity. (R. at 19-20.)

Although not required, the ALJ made alternative findings for step five of the sequential evaluation process. 20 C.F.R. §§ 416.920(e), 404.1520(e). She concluded that there are other jobs that exist in significant numbers in the national economy that Plaintiff could perform, considering Plaintiff's age, education, work experience, and residual functional capacity. (R. at 20-21.) *See* 20 C.F.R. 404.1569, 404.1569(a), 416.969, 416.969(a). Based on her review of the record and the vocational expert's testimony, the ALJ determined that Plaintiff could perform the requirements of representative occupations such as glass washer, cleaner, and agricultural packer. (R. at 20-21.) Accordingly, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 21.)

## IV. ANALYSIS

Plaintiff's appeal to this Court challenges the ALJ's finding of "not disabled," arguing that substantial evidence does not support the ALJ's findings at step three of the sequential evaluation process that her mental impairments did not satisfy the criteria of a listed impairment. (Pl.'s Mem. at 1, 11, 26.) Additionally, in her reply brief, Plaintiff raises for the first time the argument that the

---

[6] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

ALJ erred at step five of the sequential evaluation when she "found [Plaintiff] had an unimpaired ability to interact with supervisors and co-workers."[7] (Pl.'s Reply to Def.'s Mot. Summ. J., 2 (ECF No. 26) ("Pl.'s Reply Br.").)

Defendant responds that substantial evidence supports the ALJ's determination that Plaintiff failed to prove that her mental impairments did not satisfy the relevant criteria of a listed impairment. (Def.'s Mot. Summ. J., 2 (ECF No. 25) ("Def.'s Mem.").) Defendant sought leave to file a sur-reply to Plaintiff's reply brief and filed it on October 25, 2021. (ECF No. 27.) The undersigned granted Defendant's leave to file a sur-reply on November 9, 2021. (ECF No. 28). In her sur-reply, Defendant argues that Plaintiff waived her challenge to the ALJ's findings at step five by failing to present or develop it in her opening brief. (Def.'s Sur-Reply at 2, ECF No. 29.)

For the reasons set forth below, the Court finds that the ALJ erred by insufficiently explaining her conclusion that Plaintiff's mental impairments did not satisfy the listings criteria.

## A. Substantial Evidence Supports the ALJ's Findings That Plaintiff's Mental Impairments Did Not Meet or Medically Equal the Paragraph B Criteria of Listings 12.04, 12.06, 12.08, and 12.15.

Plaintiff first argues that the ALJ erred in her step-three determination that her mental health impairments did not meet or medically equal the Paragraph B criteria of Listings 12.04, 12.06, 12.08, and 12.15. Defendant responds that Plaintiff failed to establish that she experienced marked limitations pursuant to Paragraph B and that substantial evidence supports the ALJ's finding that Plaintiff experienced only moderate impairments in the relevant areas of functioning. (Def.'s Mem. at 11, 13.)

---

[7] As a general rule, issues raised for the first time in a reply brief may be deemed waived. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (quoting *Novosteel SA v. United States, Bethlehem Steel Corp*., 284 F.3d 1261, 1274 (Fed. Cir. 2002)). This is because the opposing side rarely has an opportunity to respond when an issue is not raised in the opening brief.

The SSA "has promulgated regulations containing 'listings of physical and mental impairments which, if met, are conclusive on the issue of disability.' A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citation omitted); *see* 20 C.F.R. pt. 404, Subpart P, app. 1.

In addition to the five-step analysis discussed above in Part II and outlined in 20 C.F.R. §§ 404.1520 and 416.920, the Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments. 20 C.F.R. §§ 404.1520a, 416.920a. These regulations require application of a psychiatric review technique at the second and third steps of the five-step framework, *Schmidt v. Astrue*, 496 F.3d 833, 844 n.4 (7th Cir. 2007), and at each level of administrative review. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). This technique requires the reviewing authority to determine first whether the claimant has a "medically determinable mental impairment." *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1). If the claimant is found to have such an impairment, then the reviewing authority must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," *id.* §§ 404.1520a(b)(2), 416.920a(b)(2), which specifies four broad functional areas: (1) "understand, remember, or apply information"; (2) "interact with others"; (3) "concentrate, persist, or maintain pace"; and (4) "adapt or manage oneself." *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3).

According to the regulations, if the degree of limitation in each of the four areas is rated "none" or "mild," then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe," "unless the evidence otherwise indicates that there is more than a

minimal limitation in [the claimant's] ability to do basic work activities." *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

If the claimant's mental impairment is severe, then the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). If so, then the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's residual functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). "The ALJ's decision must show the significant history and medical findings considered and must include a specific finding as to the degree of limitation in each of the four functional areas." *Felton-Miller v. Astrue*, 459 F. App'x 226, 231 (4th Cir. 2011) (per curiam) (citing 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4)); *see Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662, 659 (4th Cir. 2017). The "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review." *Patterson*, 846 F.3d at 662.

In this case, at step three of the sequential evaluation process, the ALJ thoroughly reviewed Plaintiff's medical and psychological records to determine if Plaintiff had a mental impairment that would qualify under the listings. (R. 13-19.) The ALJ reviewed Plaintiff's primary care records, hospital records, and treatment notes from 2015 through 2019. (R. 13-19.) The ALJ concluded that Plaintiff's impairments, taken alone or in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, 12.08, and 12.15. (R. at 13-14.)

i.    *The ALJ Adequately Explained Plaintiff's Limitations in the Areas of Functioning Outlined in Paragraph B of Listings 12.04, 12.06, 12.08 and 12.15, and Substantial Evidence Supports the ALJ's Findings.*

Plaintiff avers that the ALJ failed to cite to substantial evidence to support the degree of functional limitation afforded to each of the functional areas as required by the special technique analysis when determining whether Plaintiff met the Paragraph B criteria. (Pl.'s Mem. at 11.) Plaintiff reasons that the ALJ chose to discount Plaintiff's limitations by selectively discussing only a few treatment records, without addressing the abundance of contradictory, objective evidence that was material to the credibility of Plaintiff's alleged claims. (Pl.'s Mem. at 8, 24.)

Listings 12.04[8], 12.06[9], 12.08[10], and 12.15[11] are satisfied by meeting criteria in paragraphs A, which vary respectively, and either paragraphs B or C. To satisfy the Paragraph B criteria of these listings, a claimant must show that the mental impairment results in at least two marked limitations or one extreme limitation in the following:

(1)    Understand, remember, or apply information;
(2)    Interact with others;
(3)    Concentrate, persist, or maintain pace;
(4)    Adapt or manage oneself.

---

[8] Listing 12.04 addresses such disorders as depression and bipolar disorder. Paragraph A requires the Plaintiff to show medical documentation meeting the requirements of paragraph 1 ("Depressive disorder") or paragraph 2 ("Bipolar disorder"). 20 C.F.R. pt. 404, subpart. P, app.1, § 12.04A1-2.

[9] Listing 12.06 addresses anxiety and obsessive-compulsive disorders. Paragraph A requires medical documentation meeting the requirements of paragraph 1 ("Anxiety disorder"), paragraph 2 ("Panic disorder or agoraphobia"), or paragraph 3 ("Obsessive-compulsive disorder"). 20 C.F.R. pt. 404, subpart. P, app.1, § 12.06A1-3.

[10] Listing 12.08 addresses personality and impulse-control disorders. Paragraph A requires medical documentation of a pervasive pattern of one or more of the enumerated conditions. 20 C.F.R. pt. 404, subpart. P, app.1, § 12.08A1-9.

[11] Listing 12.15 addresses trauma and stressor-related disorders. Paragraph A requires medical documentation of all five of the enumerated conditions. 20 C.F.R. pt. 404, subpart. P, app.1, § 12.15A1-5.

10

20 C.F.R. Part 404, Subpart P, App. 1 §§ 12.04(B), 12.06(B), 12.08(B), and 12.15(B).

For the Paragraph B criteria, the ALJ applied the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c), 416.920a(b)-(c), and rated the degree of Plaintiff's limitations in the following functional areas: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and ability to adapt or manage oneself. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ assessed moderate restrictions in each of these four functional areas. (R. at 14.)

In finding that Plaintiff had a moderate limitation in understanding, remembering, or applying information, the ALJ noted that Plaintiff had difficulty: (1) with memory in general and understanding what is said to her; and (2) in completing tasks, although she could perform simple maintenance, shop, and drive. (R. at 14.) The ALJ acknowledged that Plaintiff was hospitalized in 2018 for psychosis and manic symptoms but explained how her symptoms improved with medication during her stay. (R. at 14, citing to R. at 415 ("Patient's response to medication was initially not as impressive but as hospitalization went on, patient's symptoms improved, medications were well tolerated, dosage was optimized, and in the past few days [symptoms] are improving.").) During appointment examinations, Plaintiff exhibited an intact memory and her cognitive functioning appeared to be normal. (R. at 14, citing R. at 414-15 ("cognition was not formally assessed but grossly appear normal, attention is fair, language, associations, and fund of knowledge fair . . . ."); R. at 456 (finding no evidence of impairment to Plaintiff's memory or thought processing); R. at 673, 798, 814 (finding no impairments in her orientation, memory, or attention).

The ALJ found that Plaintiff has a moderate limitation in interacting with others, reasoning that Plaintiff has difficulty getting along with others, reportedly had angry outbursts, but is also able

to spend time with her family. (R. at 14.) Although apparently on good terms with her siblings, children, and grandchildren, Plaintiff lived with her mother, with whom she had a "conflictual relationship." (R. at 651.) The ALJ explained that Plaintiff's outbursts and reports of isolation sometimes occurred when she was not taking her medication. (R. at 14.) She cited to a progress report in which Plaintiff relayed difficulty when speaking with multiple customer service representatives on the telephone, admitting that she hung up out of frustration with one of them. (R. at 782.) At other times, however, the ALJ noted that Plaintiff was reported to be pleasant and cooperative, exhibiting appropriate behavior and eye contact. (R. at 14, citing to R. at 415, 471, 478.) She cited to Plaintiff's medical progress notes, in which Plaintiff told her provider that she went to her brother's house for Thanksgiving in 2018. (R. at 447.) In her Adult Function Report, Plaintiff wrote that she communicates with her children every other day, her sister twice a week or less, and her brother rarely. (R. at 292.) She goes to see her granddaughter's games, and paints artwork for her grandchildren. (R. at 36, 292.) She admitted finding it difficult to maintain friendships outside of her family and testified that despite being able to "get along with anybody," she simply did not "have anybody to, you know, socialize with." (R. at 40-41.)

The ALJ also found that Plaintiff had a moderate limitation in her ability to concentrate, persist, or maintain pace. (R. at 14.) She explained that although Plaintiff stated she is limited in concentrating generally and completing tasks, she was also capable of handling her own medical care. (R. at 14.) In her Adult Function Report, Plaintiff stated that she cares for her pets, watches television, but struggles to complete tasks once she starts. (R. at 288-91.) She noted, however, that she "can do it." (R. at 290.) The ALJ also explained that Plaintiff's examinations showed that she had intact concentration, although there were reports of impulsive behavior. (R. at 14, citing 673-

74.) The ALJ reasoned that the record "fails to show any mention of distractibility," and accordingly assessed her with a moderate limitation in this functional area. (R. at 14.)

Finally, the ALJ determined that Plaintiff had a moderate limitation in her ability to adapt and manage herself. (R. at 14.) She explained that Plaintiff demonstrated difficulty in caring for her personal hygiene and cited to mentions of Plaintiff's unkempt appearance, no showering, and choice not to care for her appearance. (R. at 14, citing to R. at 289. ) She also cited to records demonstrating Plaintiff's improvement in this regard, noting that her ability to manage herself and her moods got better with medication. (R. at 14, citing to R. at 447 ("Patient states that she is more alert and able to do things since the medications were changed"); R. at 448 (describing Plaintiff's appearance as "Casually dressed and kempt."); R. at 452 (finding Plaintiff's appearance to be "Casual/appropriate"); R. at 673 (describing Plaintiff's appearance as neat); R. at 682 ("[Plaintiff] was prepared for the outing as evident of her wearing tennis shoes and being appropriately dressed . . . . [She] continues to show progress in mood regulation since her change of medication.") The ALJ pointed out that Plaintiff cares for her pets and can make her own meals, and her providers reported that she showed improvement in advocating for her needs and managing her moods with medication. (R. at 14.)

The ALJ used the "special technique" and five-point scale to carefully evaluate whether Plaintiff met listings 12.04, 12.06, 12.08, and 12.15. 20 C.F.R. Pt. 404, subpart P, App. 1. When evaluating each functional area of Paragraph B, the ALJ pointed directly to testimony and medical records that supported Plaintiff. (R. at 14.) However, throughout her analysis, the ALJ also pointed to evidence that discounted Plaintiff's testimony. (R. at 14.) For instance, with regard to understanding, remembering, or applying information, the ALJ considered that Plaintiff reported problems with her memory, but also pointed to Plaintiff's October 2018 hospital discharge

appointment, in which Plaintiff reported one of her strengths as being a "quick learner." (R. at 458.) Plaintiff remarked, "If you show me how to do something I'm good at repeating it." (R. at 458.) In her Adult Function Report, completed on December 31, 2018, Plaintiff noted that she does not need to be reminded to go places or take care of her personal needs or medicine. (R. at 290.) However, she also alleged that she does not remember what she says, never completes tasks like cleaning, and does not "understand lots of things." (R. at 293.) She said that she follows spoken instructions better than reading them, which she must often repeat before doing them. (R. at 293.) In addition, with regard to concentrating, persisting, or maintaining pace, Plaintiff noted that she has a short attention span and does not finish what she starts. (R. at 291, 293.) However, the ALJ pointed out that she is capable of making her own meals, caring for multiple pets, and handling her own medical care. (R. at 14.)

Overall, a review of Plaintiff's medical history provides substantial support for the ALJ's conclusion that Plaintiff's impairments did not meet or medically equal the Paragraph B criteria for Listings 12.04, 12.06, 12.08, and 12.15.

**B.   The ALJ Did Not Sufficiently Explain Her Listing 12.04(C), 12.06(C), and 12.15(C) Findings.**

Plaintiff next argues that there is "ample evidence in the record . . . to support a determination that her mental impairments meet the Paragraph C criteria under Listings 12.04, 1206 [sic] and/or 12.15." (Pl.'s Mem. at 28.) Plaintiff also contends that the ALJ did not sufficiently articulate how Plaintiff failed to meet the Paragraph C criteria to permit meaningful judicial review. *Id*. In response, Defendant avers that the ALJ's decision "as a whole 'sufficiently articulate[d] [a] rationale to permit judicial review.'" (Def.'s Mem. at 22 (citing *Diana S.P. v. Berryhill*, 279 F. Supp. 3d 498, 535 (E.D. Va. 2019).)

14

Like Paragraph B, Paragraph C requires Plaintiff to demonstrate that that her impairments met or medically equaled the criteria in Listings 12.04, 12.06, and 12.15.[12] The criteria for Paragraph C for these three Listings is as follows:

> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> > 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
> >
> > 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. pt. 404, Subpart P, app. 1, §§ 12.04C, 12.06C, and 12.15C.

A claimant satisfies the first prong of Paragraph C if the claimant relied, on an ongoing basis, "upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [the] mental disorder." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.G(2)(b). The regulations define psychosocial supports as including "assistance from a crisis response team, social workers, or community mental health workers who help [the person] meet . . . physical needs . . ." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.D(1)(f).

For a claimant to demonstrate that such treatment, therapy, or psychosocial support was "ongoing," the evidence must show that the claimant treated "with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for [the claimant's] medical condition." 20 C.F.R. Part 404, Subpart P, App.1, 12.00.G(2)(b). However, "[w]e will consider periods of inconsistent treatment or lack of compliance with treatment that may result from

---

[12] Paragraph C applies only to Listings 12.04, 12.06, and 12.15 because listing 12.08 contains only paragraphs A and B. *See* 20 C.F.R. pt. 404, subpart. P, app.1, § 12.08.

[the claimant's] mental disorder." *Id*. If the evidence shows that such inconsistent treatment or lack of compliance "is a feature of [the claimant's] mental disorder, and it has led to an exacerbation of your symptoms and signs, we will not use it as evidence to support a finding that you have not received ongoing medical treatment as required by [paragraph C2(1)]."

In her decision, the ALJ explained that the record does not show that Plaintiff "received medical treatment, mental health therapy, psychosocial support, or that she lived in a highly structured setting that was ongoing and that diminished the symptoms and signs of her mental disorder . . . ." (R. at 15.) Although the ALJ did not address specifically the elements of Paragraph C(1), her narrative analysis cited to records evincing that Plaintiff relied on ongoing mental health treatment to diminish her symptoms. (R. at 18, citing to R. at 47-61,463-66,471-86, 603-52.) Specifically, the ALJ noted:

> Despite continued treatment and mental health skill building, most examinations revealed a normal memory, intact concentration, cooperative behavior, and appropriate dress and grooming. The claimant reported she played with her animals, went grocery shopping, watched TV, painted, cleaned, gardened, spent time with her family, went on vacation with her family, visited during holidays, went to two basketball games with family, and felt better on her medication . . . . The claimant also reported quitting her mood stabilizer in 2019.

(R. at 18.) (internal citations omitted). She also acknowledged that "providers reported [Plaintiff] had improved in advocating for her needs, and [she] reported her moods were more manageable with medication." (R. at 14.)

The record reflects that due to the nature of Plaintiff's mental disorder, she was placed under an emergency custody order on September 26, 2018 and taken to the emergency department by law enforcement, where she was treated for psychosis and mania. (R. at 416.) She arrived with makeup drawn across her face in black and tan marks and "did not appear to have any insight into the

16

severity of her actions earlier [that day] that resulted to [sic] her being brought to the [emergency department]." (R. at 416.) She told emergency department personnel that she was "feeling more depressed lately and admitted that she has not been taking her prescribed Wellbutrin as indicated due to perceived lack of benefit. [Plaintiff] endorsed a recent decline in overall functioning and admitted to not bathing, changing clothes, brushing teeth or attending to other daily needs." (R. at 417.) She was voluntarily admitted into inpatient psychiatric care. (R. at 416.) During the course of her hospitalization, Plaintiff was given medication, which improved her symptoms over several days, and was finally discharged after two weeks. (R. at 415.) Subsequently she began outpatient treatment consisting of medication management and therapy between October 2018 through August 2019. (R. at 446-458, 470-486, 603-650.)

On October 16, 2018, Plaintiff reported that she was taking her medication, although it made her feel lethargic and unmotivated. (R. at 649.) At her follow-up appointment on January 22, 2019, she presented as "very tearful, irritable, mood very labile in session." (R. at 647.) She reported that her medications helped with her anxiety, and she felt improved since October 2018. (R. at 647.) On February 5, 2019, Plaintiff told her provider that she "continues to struggle, especially in places where she doesn't feel safe. Feels she has a 'road rage' attitude around places unfamiliar. Scared that her mouth will get her in trouble." (R. at 645.) She presented as tearful, "overwhelmed at times with the negative aspects of her life," and admitted to speaking disrespectfully with others in unfamiliar public places. (R. at 645.)

The following week, Plaintiff reported feeling paranoid that others in her neighborhood and Wal-Mart stare at her and make fun of her because of her weight, although she noted that her medication helped improve her moods. (R. at 643.) Her treatment goals continued to be to increase coping skills and self-care. (R. at 643.) At the end of February 2019, Plaintiff presented "more upset

17

and dysregulated [sic]," tearful at times, and felt more disconnected with her family. (R. at 639.) In early March, Plaintiff presented again "very tearful" and reported being "tired of crying and feel[ing] hopeless that she will never be able to work through all her issues." (R. at 637.) She continued to take her medication as prescribed. (R. at 637.) She was tearful at her appointment on March 12, 2019 and stated that her mood fluctuates especially when interacting with her husband. (R. at 635.) While she had "decreased crying spells" at her April 2, 2019 session, she was able to "easily switch" to crying on April 23, 2019, where she reported having an "irrational fear" about going out in public and "falling on her face and scaring her face." (R. at 627.) On May 2, 2019 she reported that she continued to isolate at home, was fearful of going out in public, and became paranoid and afraid that others may not believe that she is mentally ill. (R. at 623.) She appeared "in no acute distress" at her appointment on June 17, 2019, complaining of pain and "white stuff in ears." (R. at 590.)

At her August 19, 2019 appointment, she was reportedly "[v]ery [l]abile . . . lots of crying and anger, irritability." (R. at 605.) On August 26, 2019, her provider noted that Plaintiff continued to "struggle with healthy relationships and communication," and was "again tearful, struggles with mood regulation, feels she is []constantly triggered, then gets depressed which makes her more depressed." (R. at 603.)

In addition to her mental health therapy, Plaintiff received ongoing psychosocial support and mental health skills assistance from Dominion Day Services, beginning May 4, 2019. (R. at 670-815.) According to her individualized service plan, it was recommended that Plaintiff treat with them three times a week for a total of seven hours over approximately six months. (R. at 775.) Plaintiff's presenting problems were her anxiety when she is outside her home and "significant amounts of sadness and resentment towards her mother." (R. at 775.) Although admittedly "'not

18

scared of people,'" she struggled to build healthy relationships, had no desire for friendships, and lacked the coping skills needed to calm her anxiety. (R. at 672, 775.) She noted that she used non-emergency medical transportation services to get to her medical appointments and the grocery store, and identified her support system as her dog, rabbit, and doctors. (R. at 672-73.)

Plaintiff's social worker, Jordan Florida, MSW, LMHP ("Ms. Florida") testified at Plaintiff's hearing about Plaintiff's goals, which included moving out of her mother's trailer home, obtaining disability benefits and transportation, wearing appropriate clothing and regularly bathing, and improving her diet. (R. at 63-64.) Ms. Florida told the ALJ that "we're pretty much at ground zero with her because we're still trying to get the [activities of daily living] down," and "working on just basic skills with her." (R. at 63-64.) When asked for clarification on this, Ms. Florida testified that Plaintiff does not bathe, brush her teeth, or dress appropriately for her surroundings. (R. at 64-65.) Ms. Florida added that Plaintiff "doesn't eat healthy," but has "improved drastically" with her diet, although independently "doesn't make the best choices." (R. at 64.) When asked how frequently Plaintiff leaves the house on her own, Ms. Florida replied, as far as she knows, "never." (R. at 64.) Ms. Florida picks up Plaintiff for her appointments and stated that Plaintiff's mother drives her to the store. (R. at 64.) She described how Plaintiff "does not read people appropriately," and gave examples of Plaintiff becoming angry with receptionists, employees at drug stores, and perceived authority figures. (R. at 65.) On one occasion, Plaintiff told Ms. Florida, "if you weren't here with me, I would have either punched [the receptionist] or punched the wall." (R. at 65.) When asked if these incidents occurred in the last two months, Ms. Florida replied "[s]ince I've been working with her. There's been a significant decline in her, I would say within the past – we've noticed a big difference within the past three months." (R. at 66.)

The second prong of Paragraph C requires evidence of a minimal capacity to adapt to changes in the claimant's environment or to adapt to demands not already part of daily life, such as the inability to function outside of the home without substantial psychosocial supports. 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00G(2)(c). Psychosocial supports include "help from family members or other people who monitor your daily activities and help you to function." *Id.* § 12.00D(1)(a). Additionally, "[w]e will consider that [the claimant has] achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of [claimant's] symptoms and signs and to deterioration in [claimant's] functioning." 20 C.F.R. Part 404, Subpart P., App. 1, 12.00G(2)(c). Accordingly, "because of the nature of [the claimant's] mental disorder, evidence may document episodes of deterioration that have required [the claimant] to be hospitalized or absent from work . . . ." *Id.*

With respect to the second prong – marginal adjustment – the ALJ concluded that "[t]he record does not show . . . that [Plaintiff] had marginal adjustment (minimal capacity to adapt to changes in her environment or to demands that were not already part of her daily life (see 12.00G2c))." (R. at 15.) However, the ALJ did not explain whether Plaintiff manifested greater than marginal adjustment beyond Plaintiff's occasional appropriate dress and calm or "good mood" at certain medical appointments or Plaintiff's ability to care for her animals, cook, and watch television. (R. at 14, 17.) The ALJ also mentioned Plaintiff's reports of "spending time with her family, going on vacation with them, calling doctors and the insurance company," as evidence of more than marginal adjustment. (R. at 17.)

As Plaintiff points out, however, the ALJ appeared to have overlooked portions of the records she cited which provide further context. (Pl.'s Mem. at 16, 20.) For example, the ALJ found that Plaintiff reported spending time with her family as evidence supporting the finding of non-

disability. (R. at 14 ("Here, the claimant alleged that she has difficulty getting along with others. However, according to her statements, the claimant is also able to spend time with friends and family.").) However, the records cited by the ALJ showed that Plaintiff was anxious about her upcoming family trip and later withdrew and isolated herself from her family. (R. at 613, 782.) She also reported feeling like giving up in her attempts to forge relationships with family members. (R. at 613.) In fact, Plaintiff told her social worker that she "went on vacation with family, became overwhelmed and thought family was making fun of her. Patient withdrew which only made things worse for patient." (R. at 613.) The records do not make note of Plaintiff's ability to spend time with friends. To the contrary, Plaintiff's medical records frequently note her lack of skills or desire to make and maintain friendships. (*See e.g.*, R. at 40 (testifying that she felt unable to keep up with the responsibilities of a friendship); R. at 672 ("[Plaintiff] reported that she 'has no friends.' When [] asked if she has a desire for friendships, [Plaintiff] responded 'heck no. I don't want the responsibility.'"), R. at 687 ("[Plaintiff] struggles to build healthy relationships and stated 'no one cares about me.'").)

Additionally, while the ALJ correctly noted that Plaintiff was capable of calling her doctors and the insurance company representatives, the treatment record cited by the ALJ in support of her findings showed that Plaintiff became frustrated with one of the insurance representatives and ended the phone call. (Pl.'s Mem. at 20.) (R. at 782.) Further, although the ALJ acknowledged that Plaintiff felt less depressed since increasing her medication dosage, she also noted that Plaintiff reported "mood reactivity, isolation, uncontrollable anger, impulsivity, recurrent suicidal threats, paranoia, past trauma, and convulsive crying." (R. at 17.) The ALJ explained that Plaintiff exhibited a "lack of emotional regulation" in August 2019, when Plaintiff became angry with staff at a dental office regarding the cost of services. (R. at 17, citing to R. at 738.) She also cited to a report from

September 26, 2019 in which Plaintiff cried while on a phone call with the Program Director regarding her social worker's decision to conduct services outside the home. (R. at 726.) Plaintiff contacted the Program Director again on September 30, 2019 and "was hysterical on the phone stating that 'no one is helping her.'" (R. at 724.) During the call, Plaintiff "continued to heighten in hysterics as evidenced by her crying to the degree that the Program Director could not understand her . . . . Plaintiff proceeded to say, 'you're a jerk. You're not listening to me." (R. at 724.) Plaintiff continued to yell at the Program Director until the Program Director ended the call. (R. at 724.)

The ALJ explained that "[d]espite a few reports of just sponge baths or disheveled hair, providers at Dominion regularly reported appropriate dress and a calm or good mood." (R. at 17, internal citations omitted.) At an appointment in late October 2019, the ALJ pointed out that although "appropriately dressed," Plaintiff admitted that she had not showered "in a while." (R. at 701.) During that encounter, when asked how she was doing, Plaintiff "began to hysterically cry," and then stated that she feels she will "'never been [sic] ok again.'" (R. at 701.) Plaintiff presented as "disheveled and un-bathed" at a November 2019 session, but appeared "to show progress in mood regulation since her change of medication." (R. at 682, 684.)

It is not the responsibility of this Court to conclusively establish whether Plaintiff actually meets or medically equals sections 12.04, 12.06, or 12.15 of the Listings. However, the undersigned is not persuaded that the ALJ's discussion of the evidence was sufficient to permit this Court meaningful review. The cursory nature of the ALJ's assessment as to the criteria under Paragraph C lacked an adequate explanation as to why Plaintiff failed to satisfy these criteria. Without an adequate explanation, it is impossible for the undersigned to properly assess and determine whether the ALJ's assessment as to Paragraph C is supported by substantial evidence. Because the ALJ did not provide sufficient specifics in her Paragraph C analysis, the basis for her decision is unclear.

The undersigned has no choice but to recommend remand as it is not possible, from reading the ALJ's decision, to determine whether there is substantial evidence to support the ALJ's conclusion regarding Paragraph C of the Listings.

## C.  Plaintiff's Remaining Allegations.

Plaintiff also argues that the ALJ erred when she found Plaintiff's mental health impairments to be non-severe but failed to properly consider their effects in subsequent steps of the evaluation process. (Pl.'s Mem. at 8.) Because the undersigned recommends remand based on the ALJ's evaluation of the Listings, the undersigned declines to address Plaintiff's remaining allegations of error. *See Boone v. Barnhart*, 353 F.3d 203, 211 n. 19 (3d Cir. 2003) (remanding on a particular ground and declining to address claimant's additional arguments). However, the Commissioner should consider them on remand.

## V. CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 23) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 25) be DENIED and the final decision of the Commissioner be VACATED and REMANDED.

Let the Clerk file a copy of this Report and Recommendation electronically, notify all counsel of record and forward a copy to United States District Judge David J. Novak.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/ MRC_____
Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: <u>May 5, 2022</u>